# DEFENDANT INFORMATION RELATIVE TO A CRIMINAL ACTION - IN U.S. DISTRICT COURT

BY: [X] COMPLAINT   [ ] INFORMATION   [ ] INDICTMENT   [ ] SUPERSEDING

**Name of District Court, and/or Judge/Magistrate Location**
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND DIVISION

## OFFENSE CHARGED

21 USC § 841(a)(1), (b)(1)(C)

[ ] Petty
[ ] Minor
[ ] Misdemeanor
[X] Felony

**PENALTY:**
- Imprisonment: Min. 5 – Max. 40 years
- Fine: $5 million
- Supervised release term: Min. 4 years – Max. life
- Special assessment: $100
- Forfeiture
- Deportation
- Denial of Federal Benefits

**DEFENDANT - U.S**
▶ PEDRO GALEANO-LOBO,

**DISTRICT COURT NUMBER**
**FILED UNDER SEAL**
4:25-mj-70862 MAG

**FILED**
Jul 14 2025
Mark B. Busby
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND

## PROCEEDING

Name of Complainant Agency, or Person (& Title, if any)
DEA

[ ] person is awaiting trial in another Federal or State Court, give name of court

[ ] this person/proceeding is transferred from another district per (circle one) FRCrp 20, 21, or 40. Show District

[ ] this is a reprosecution of charges previously dismissed which were dismissed on motion of:
  [ ] U.S. ATTORNEY   [ ] DEFENSE

SHOW DOCKET NO.

[ ] this prosecution relates to a pending case involving this same defendant

MAGISTRATE CASE NO.

[ ] prior proceedings or appearance(s) before U.S. Magistrate regarding this defendant were recorded under

Name and Office of Person Furnishing Information on this form: Craig H. Missakian
[X] U.S. Attorney   [ ] Other U.S. Agency

Name of Assistant U.S. Attorney (if assigned): Ivana Djak

## DEFENDANT

**IS NOT IN CUSTODY**
1) [X] Has not been arrested, pending outcome this proceeding. If not detained give date any prior summons was served on above charges ▶ _____

2) [ ] Is a Fugitive

3) [ ] Is on Bail or Release from (show District) _____

**IS IN CUSTODY**
4) [ ] On this charge
5) [ ] On another conviction   [ ] Federal [ ] State
6) [ ] Awaiting trial on other charges
If answer to (6) is "Yes", show name of institution _____

Has detainer been filed? [ ] Yes [ ] No   If "Yes" give date filed _____

**DATE OF ARREST** ▶ Month/Day/Year _____
Or... if Arresting Agency & Warrant were not
**DATE TRANSFERRED TO U.S. CUSTODY** ▶ Month/Day/Year _____

[ ] This report amends AO 257 previously submitted

## ADDITIONAL INFORMATION OR COMMENTS

**PROCESS:**
[ ] SUMMONS   [ ] NO PROCESS*   [X] WARRANT    Bail Amount: _____

If Summons, complete following:
[ ] Arraignment   [ ] Initial Appearance

Defendant Address:

* Where defendant previously apprehended on complaint, no new summons or warrant needed, since Magistrate has scheduled arraignment

Date/Time: _____   Before Judge: _____

Comments:

# UNITED STATES DISTRICT COURT
for the
Northern District of California

**FILED UNDER SEAL**

| United States of America | ) |
| v. | ) |
| PEDRO GALEANO-LOBO, | ) Case No. 4:25-mj-70862 MAG |
| | ) |
| *Defendant(s)* | ) |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of __June 10, 2025__ in the county of __Alameda__ in the __Northern__ District of __California__, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 21 USC § 841(a)(1), (b)(1)(B) | Distribution of 40 grams or more of a mixture or substance containing a detectable amount of fentanyl |

**FILED**

Jul 14 2025

Mark B. Busby
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND

This criminal complaint is based on these facts:

See attached Affidavit of Special Agent Adam Jones, Drug Enforcement Administration

☑ Continued on the attached sheet.

Approved as to form /s/ Ivana Djak
AUSA IVANA DJAK

/s/ Adam Jones
*Complainant's signature*

Adam Jones, Special Agent, DEA
*Printed name and title*

Sworn to before me by telephone.

Date: 07/13/2025

*Judge's signature*

City and state: Oakland, CA

Hon. Kandis A. Westmore, U.S. Magistrate Judge
*Printed name and title*

# AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR AN ARREST WARRANT AND CRIMINAL COMPLAINT

I, Adam Jones, a Special Agent with the Drug Enforcement Administration (DEA), having been duly sworn, hereby depose and state as follows:

## INTRODUCTION

1. I make this affidavit in support of an application for an arrest warrant and criminal complaint charging PEDRO GALEANO-LOBO AKA JOSE LUIS CARCAMO (hereinafter GALEANO-LOBO) with 21 U.S.C. §§ 841(a)(1) and (b)(1)(B), based on his distribution of 40 grams or more of a mixture or substance containing a detectable amount of fentanyl (N-phenyl-N-[ 1-( 2-phenylethyl ) -4-piperidinyl ] propanamide), occurring on or about June 10, 2025, in Oakland, California, in the Northern District of California.

## SOURCES OF INFORMATION

2. The facts in this affidavit come from my personal observations, my training and experience, information from records and databases, and information obtained from other agents, officers, and witnesses. Where statements made by other individuals (including other law enforcement officers or agents) are referenced in this Affidavit, such statements are described in sum and substance and in relevant part. Similarly, where information contained in reports and other documents or records is referenced in this Affidavit, such information is also described in sum and substance and in relevant part.

3. Because this Affidavit is submitted for the limited purpose of establishing probable cause for a criminal complaint and arrest warrant, I have not included each and every fact known to me about this case. Rather, I have set forth only the facts that I believe are necessary to support probable cause for a criminal complaint and arrest warrant. My understanding of the facts and circumstances of the case may evolve as the investigation continues.

## AFFIANT BACKGROUND

4. I am employed by the United States Department of Justice, Drug Enforcement Administration (DEA), as a Special Agent and have been so employed since January 2023.

5. I received 16 weeks of specialized drug law enforcement training at the DEA training academy in Quantico, Virginia. The training curriculum covered all aspects of drug investigations, including identification of controlled substances, physical and electronic surveillance, utilization of confidential sources, interview techniques, undercover operations, financial investigations, money laundering techniques, and the general operation of drug trafficking organizations. This training included instruction in the investigation of federal drug violations, including, but not limited to Title 21, United States Code, Sections 841 and 846. Additionally, this training included several hundred hours of comprehensive, formalized instruction in, but not limited to, narcotics investigations, drug identification, detection, interdiction, financial investigations and money laundering, identification and seizure of drug related assets, undercover operations, and electronic and physical surveillance procedures.

6. During the course of my employment as a DEA SA, I have participated in numerous narcotics investigations. I have debriefed confidential sources, and witnesses who had personal knowledge regarding narcotics trafficking organizations. In addition, I have discussed with numerous law enforcement officers and confidential sources the methods and practices used by narcotics traffickers. I have also participated in many aspects of drug investigations including, but not limited to telephone toll analysis, physical surveillance, and assisted in court ordered wiretap investigations. Moreover, I have executed federal narcotics search and arrest warrants that resulted in the arrest of suspects and seizure of narcotics.

7. Through my training, education, experience, and my conversations with other agents and officers who conduct drug investigations, I have become familiar with narcotics traffickers' use of mobile telephones, and their use of numerical codes and code words to conduct their business. Also, I have become familiar with narcotics traffickers' methods of

2

operation, including, but not limited to, the manufacturing, distribution, storage, and transportation of narcotics, and the methods used by drug traffickers to collect, transport, safeguard, remit, and/or launder drug proceeds.

8. I have initiated and/or participated in numerous Organized Crime Drug Enforcement Task Force ("OCDETF") investigation. The OCDETF program is part of the United States Attorney General's strategy to reduce the availability of drugs by disrupting major trafficking organizations through joint collaborations across agencies.

9. Over the past two years, I have worked with other experienced agents, law enforcement officers and prosecutors on cases that apply use of electronic surveillance to investigating Drug Trafficking Organizations ("DTOs") that are trafficking narcotics across multiple jurisdictions within the United States.

10. I have monitored, supervised, conducted surveillance, or otherwise participated in several investigations that utilized electronic and/or wire interceptions. In the course of working on investigations using electronic and/or wire interception, I have monitored, listened to, reviewed transcripts and/or "line sheets" of over 500 intercepted conversations. I estimate that the majority of these conversations were in Spanish and involved the trafficking of methamphetamine, cocaine, heroin, and fentanyl by DTOs, and that the majority of the narcotics trafficking conversations intercepted employed some form of code to thwart law enforcement.

11. I have participated in the investigation discussed in this Affidavit. I also have discussed the investigation with other DEA agents and with other law enforcement agencies involved in it. I have reviewed records and reports relating to the investigation. Unless otherwise noted, wherever in this Affidavit I assert that a statement was made, the information was provided by another DEA agent, law enforcement officer, or witness who may have had either direct or hearsay knowledge of that statement and to whom I or others have spoken, or whose reports I have read and reviewed.

12. This affidavit is intended to show merely that there is sufficient probable cause

for the requested warrants and does not set forth all of my knowledge about this matter.

## APPLICABLE STATUTE

13. Distribution of Controlled Substance. Under Title 21, United States Code, Section 841(a)(1), (b)(1)(C) it is unlawful for any person to knowingly distribute a federally controlled substance. Under 21 C.F.R. § 1308.12, fentanyl and methamphetamine are Schedule II controlled substances.

## STATEMENT OF PROBABLE CAUSE

14. Between on or about April 30, 2025, and on or about June 10, 2025, GALEANO-LOBO sold an undercover law enforcement officer (the "UC") suspected controlled substances four times in Oakland, California, in the Northern District of California. During each of the controlled purchases described herein, the UC had an audio and visual recording device.

15. On April 30, 2025, GALEANO-LOBO sold approximately 28.6 gross grams of fentanyl to the UC for $1,000. The drugs were confirmed to be fentanyl by laboratory testing. On May 14, 2025, GALEANO-LOBO sold approximately 86.5 gross grams of fentanyl to the UC for $3,000. The drugs tested positive as fentanyl on a TruNarc testing device. On May 29, 2025, GALEANO-LOBO sold approximately 934.4 gross grams of methamphetamine to the UC for $3500. The drugs tested positive as methamphetamine on a TruNarc testing device. The drugs from both the May 14 and May 29, 2025, UC buys have been sent for further laboratory testing and the results are pending.

16. On or about June 10, 2025, law enforcement officers conducted a controlled buy of fentanyl from GALEANO-LOBO in Oakland. On June 4, 2025, the UC communicated with GALEANO-LOBO and requested to purchase methamphetamine. GALEANO-LOBO stated he was working to secure the methamphetamine, and the UC told GALEANO-LOBO that he would call him back. On June 10, 2025, at approximately 11:48 a.m., the UC called GALEANO-LOBO again and requested to purchase three pounds of methamphetamine. GALEANO-LOBO told the UC he was working on talking to his supplier, and instructed the UC to call him back.

GALEANO-LOBO and the UC had two further calls, on which GALEANO-LOBO explained that he had one pound of methamphetamine that he could provide that day, but that he had more fentanyl. Ultimately, the UC agreed to purchase six and a half ounces of fentanyl for $4,500. The UC and GALEANO-LOBO agreed to meet near the Coliseum BART parking lot at 2:30 p.m. on June 10, 2025.

17. The DEA and partner law enforcement agencies had surveillance teams positioned near the meet up location, as well as at GALEAN-LOBO's known residence on 65th Ave. in Oakland, California. Law enforcement officers know the location of GALEANO-LOBO's residence based on previous investigation. At approximately 2:16 p.m., the UC again called GALEANO-LOBO and told GALEANO-LOBO that he was 15 minutes away. GALEANO-LOBO agreed that they would meet in 15 minutes.

18. At approximately 2:20 p.m., the law enforcement officers on the surveillance team at GALEANO-LOBO's residence observed GALEANO-LOBO leave his residence, enter his known vehicle, a silver 2021 Toyota Tacoma with Tennessee License Plate #****MBH, and drive south on MacArthur Blvd. and park on the side of the street on MacArthur Blvd. near the intersection of 68th Ave. in Oakland. Law enforcement officers know GALEANO-LOBO's vehicle based on previous investigation. A DEA SA observed GALEANO-LOBO exit his vehicle and walk north towards a white Mazda that was parked on the side of the street. GALEANO-LOBO was seen passing a small item to the unidentified male driver of the white Mazda. GALEAO-LOBO was then observed getting back into his vehicle and driving back to his residence.

19. At about 2:29 p.m., GALEANO-LOBO was observed getting into a black Honda Accord bearing CA License Plate #****520 driven by another unknown individual. The black Honda then departed GALEANO-LOBO's residence and drove him to the meet up location near the Coliseum BART station. At approximately 2:45 p.m., the UC observed GALEANO-LOBO walking toward the UC's vehicle. GALEANO-LOBO approached the front passenger side of the

UC's vehicle, and the UC greeted GALEANO-LOBO through the open front passenger side window.  The UC told GALEANO-LOBO he had been looking for his truck (as GALEANO-LOBO had previously driven his own vehicle to the UC purchases) and asked if GALEANO-LOBO had walked.  GALEANO-LOBO stated (falsely) that he had walked.  GALEANO-LOBO then requested that the UC drive away from the meeting location down the street.  GALEANO-LOBO was holding two canned beverages and asked if the UC wanted one.  The UC examined the beverages and said that he would try.  The UC then accepted a coconut water beverage from GALEANO-LOBO.  The UC then retrieved $4,500 U.S. currency.  GALEANO-LOBO then retrieved a brown paper bag from GALEANO-LOBO's front hoodie pocket.  GALEANO-LOBO handed the brown paper bag to the UC and the UC handed GALEANO-LOBO the $4,500 in U.S. currency.  The UC looked into the brown paper bag and saw multiple blocks of white substance wrapped in clear plastic.  GALEANO-LOBO and the UC then further discussed future potential drug purchases and drug pricing.  The UC specifically asked GALEANO-LOBO if he could secure a kilo of fentanyl and for how much.  GALEANO-LOBO stated that he could secure a kilo of fentanyl for $ 24,000.

20. The UC and GALEANO-LOBO then examined a hidden compartment in the UC's vehicle and discussed the potential of the UC transporting drugs.  The meeting concluded.  GALEANO-LOBO walked away from the meeting location and the UC drove away from the meeting location.  GALEANO-LOBO walked north on the sidewalk on Snell Street and then crossed over the street and entered the rear door of the black Honda.  The black Honda then took a circuitous longer path to drive back to GALEANO-LOBO's residence.  After the black Honda dropped GALEANO-LOBO off at his residence at about 3:05 p.m., it continued to drive in erratic circular paths that law enforcement officers believed to be evasive counter-surveillance maneuvers to avoid detection by law enforcement.

21. The drugs from the June 10, 2025 UC purchase weighed 281.5 gross grams and tested positive as fentanyl on a TruNarc testing device, and have been sent out for further

6

laboratory testing.

## CONCLUSION

22.     Based on the information above, there is probable cause to believe that on or about June 10, 2025, GALEANO-LOBO knowingly and intentionally distributed 40 grams or more of a mixture and substance containing a detectable amount of (N-phenyl-N- [ 1- ( 2-phenylethyl ) -4-piperidinyl ] propanamide), a Schedule II controlled substance, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(B).  Accordingly, I respectfully request that the Court issue a criminal complaint and a warrant for his arrest.

*/s/ Adam Jones*

_____

Adam Jones
Special Agent
Drug Enforcement Administration

Sworn to before me over the telephone and signed by me pursuant to Fed. R. Crim. P. 4.1 and 4(d) on this 13th day of July 2025.

_____
HON. KANDIS A. WESTMORE
United States Magistrate Judge